UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. _____21CV540_____



FILED

JUN 3 0 2021

| | | |
|---|---|---|
| TONMOY S. NASIRI, *Pro Se* | § § § | IN THE MIDDLE DISTRICT COURT OF NORTH CAROLINA |
| Plaintiff | § § | |
| vs | § § | L. RICHARDSON PREYER COURTHOUSE |
| UNC MEDICAL CENTER | § § § | |
| Defendant | § § § | 324 W MARKET STREET GREENSBORO, NORTH CAROLINA 27401 |
| | § § | |

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW TONMOY S. NASIRI, complaining of UNC MEDICAL CENTER, and in support thereof would show as follows:

### I.
### DISCOVERY LEVEL

Discovery in this case is intended to be conducted under Rule 26 of the Federal Rules of Civil Procedure.

### II.
### PARTIES

Plaintiff: TONMOY S. NASIRI is an individual residing in Durham County, North. Carolina at 4318 Flintlock Ln, Durham, NC 27704. Phone: (919)-724-0265 | email: teanasiri@gmail.com

Defendant: UNC MEDICAL CENTER is a publicly funded hospital facility located at 101 Manning Drive, Chapel Hill, North Carolina 27514.

1

### III.
### JURISDICTION AND VENUE

The venue, the United States District Court for the Middle District of North Carolina, is located at the John Hervey Wheeler United States Courthouse, whose address is 323 E. Chapel Hill Street, Durham, North Carolina 27702. Venue is legally appropriate because the L. Richardson Preyer courthouse has federal jurisdiction over the entirety of civil offenses perpetrated anywhere in Orange County, North Carolina – which includes UNC Medical Center located in Chapel Hill, North Carolina.

### IV.
### STATEMENT OF FACTS

1. On 02/21/13 the Plaintiff went to UNC Medical Center to be evaluated by psychiatric consult as per request of Plaintiff's University of North Carolina at Chapel Hill Counseling and Psychological Services (CAPS) therapist named Abigail (Abby) Zeveloff. The Plaintiff was evaluated by Dr. William Matthews and a nurse, and the Plaintiff was found to be healthy enough to be discharged home, a decision made by attending Dr. Cort A. Pederson and Dr. Matthews.

2. Dr. Christopher Forsythe, Dr. Jane Brice, and Dr. Ian Martin committed healthcare fraud on 02/21/13 as they entered fake medical records into the Plaintiff's official medical records – without having any official duty to treat the Plaintiff. These physicians wrote evaluations of the Plaintiff into the medical records, even though they were never part of his treatment team and never even met the Plaintiff.

3. Upon examination of the Plaintiff's 2013 UNC medical records, it is peculiar to find that during the same initial visit to the UNC Medical Center on 02/21/13, a physician authorized an antibiotic treatment ("Ceftriaxone 1gm IVPB in 100 mL NS over 30 minutes, via IV pump") that was to be delivered by intravenous (IV) means – directly into the Plaintiff's bloodstream. The Plaintiff however, did not have any infection of any kind, so why was an antibiotic IV really ordered the night of 02/21/13?

4. On 02/26/13, the Plaintiff went to a routine therapist follow-up appointment with Abigail Zeveloff. During the beginning of the meeting, the Plaintiff told Zeveloff that he felt completely fine and healthy, and that nothing was bothering him.

5. Suddenly, Zeveloff let the Plaintiff know that she wanted Dr. Allen H. O'barr, the director of CAPS, to come in to Zeveloff's office and talk with the Plaintiff. Zeveloff left the room for a short period and soon returned with Dr. O'barr. The Plaintiff immediately told O'barr that the prescription medication (Seroquel 50 mg) that O'barr prescribed the Plaintiff over the phone could have killed the Plaintiff (as indicated on the medication bottle label). **Please note that the Plaintiff is in possession of an audio recording of this entire series of events.**

2

6. O'barr immediately retaliated against the Plaintiff and insisted that the Plaintiff go to the hospital. The patient initially did not give consent to go to the hospital, but eventually the Plaintiff, Zeveloff, and O'barr walked into UNC Medical Center and the Plaintiff was brought into a triage room, where a nurse named Michael Siebenthaler posed as a physician (by wearing a whitecoat and stating that he was a doctor) and gave the Plaintiff an initial evaluation, where Zeveloff and O'barr were eyewitnesses and participators in Siebenthaler's evaluation.

7. Next, the Plaintiff was escorted down the hall from the triage room and entered another room where the Plaintiff was instructed to change his close and put on a purple hospital gown by a nurse named Anthony. The Plaintiff was then escorted to the psychiatric emergency room, which locked and confined the Plaintiff for a period of several hours while he waited for a psychiatric consult.

8. The Plaintiff was involved with a hidden/covered-up hospital admission on 02/26/13 by signing documentation (with Dr. Elizabeth Cox signing the documentation as a witness) that would allow for the Voluntary Commitment of the Plaintiff. This Voluntary Commitment documentation's evidence was destroyed by UNC Medical Center personnel who also may have been involved in the Voluntary Commitment documentation's replacement with illegitimate Involuntary Commitment documentation (which was filed by Dr. Kenan M. Penaskovic). These personnel from UNC Medical Center should be held liable under **NC GS § 122C-204.**

9. The Plaintiff was illegally admitted to the inpatient unit on 02/26/13 at the North Carolina Neurosciences Hospital and held against his will (in false imprisonment) until 03/04/13. This was accomplished by the filing of illegitimate Involuntary Commitment documentation by Dr. Kenan M. Penaskovic. The entire process of the abduction/kidnapping was masterminded by Dr. Allen H. O'barr, Dr. Kenan M. Penaskovic, and Dr. Angela K. Strain who all should be held liable under **NC GS § 122C-204,** for the Plaintiff's illegitimate admission into the psychiatric inpatient unit on the night of 02/26/13.

10. Note the Plaintiff's father, Dr. Mohammad Nasiri, saw a digital copy of the Voluntary Commitment documentation (that both the Plaintiff and Dr. Elizabeth Cox signed on 02/26/13) on one of the portable computers Dr. Penaskovic used on one of the days Dr. Mohammad Nasiri came to visit the Plaintiff in the NC Neurosciences Hospital between 02/26/13 – 03/04/13. Therefore, there existed **both** a Voluntary admission and an Involuntary admission into the hospital. This is highly questionable.

11. Please note that at absolutely no time either before, during, or after the abduction/kidnapping did the plaintiff show signs of either dangerousness to self, as defined in **NC G.S. 122C-3(11)a,** or dangerousness to others as defined in **NC G.S. 122C-3(11)b** – as the Plaintiff did not demonstrate any behavior that would fit the criteria for holding a patient under Involuntary Commitment status.

12. Please also note that one of the Plaintiff's friends named Pavan D. Patel, visited the Plaintiff several times while the Plaintiff was held in false imprisonment at the psychiatric ward in

3

between 02/26/13 – 03/04/13. In addition to Mr. Patel and Dr. Mohammad Nasiri visiting, the Plaintiff's younger sister, Shayla Nasiri, and the Plaintiff's mother, Mamtaz Begum, visited the Plaintiff one day. The Plaintiff's mother was brought to tears as she could not understand why her son was being held against his will, seeing that her son had been kidnapped by hospital associates and was being tortured in the hospital. This entire series of events was a horrific experience for the entire Nasiri family.

13. Please note that at no time during the 02/26/13 – 03/04/13 episode, absolutely no legal remedies were afforded to the Plaintiff. The Plaintiff was held against his will in false imprisonment for a period of about 7 days, yet the Plaintiff was never given his court date to discuss the "Involuntary Commitment" status with any legal authorities – a right guaranteed by **NC G.S. Section 122C-268.**

14. **After** the 02/26/13 – 03/04/13 "Involuntary Commitment" status at the UNC Medical Center, the Plaintiff was able to pass numerous background checks conducted by the FBI's National Instant Criminal Background Check System (NICS), the ATF, and the Cumberland County Sheriff's Office. **The Plaintiff passed all of these background checks and subsequently legally purchased several firearms *after* he was so-called placed under "Involuntary Commitment" status between 02/26/13 – 03/04/13 at the UNC Medical Center.**
   - It should be noted that anyone who has been legitimately admitted to a psychiatric facility under Involuntary Commitment status in the past would never be able to pass these background checks to legally purchase firearms from any Federal Firearms Licensee (FFL). How the Plaintiff passed the background checks to purchase firearms (even after being held under "Involuntary Commitment" status) is a question begging for an answer.
   - One day the Plaintiff placed a shotgun he had purchased from Gander Mountain (in Fayetteville, NC) in his father's home. Dr. Nasiri took photographs of the firearm and submitted them to the UNC Medical Center legal associates during the Plaintiff's one and only district court hearing (to resolve his Involuntary Commitment status) later in late January/early February 2015.
   - Please note the Plaintiff no longer possesses any firearms whatsoever, as all of the firearms were donated to the Fayetteville Police Department in 2015.

15. The Plaintiff visited the Orange County Sheriff's Office in an attempt for law enforcement to become involved and investigate the Plaintiff's 02/26/13 – 03/04/13 abduction at the UNC Medical Center. The Plaintiff hoped for an official police report to be filed at the Sheriff's Office (located at 106 E. Margaret Ln, Hillsborough, North Carolina 27278). The Orange County Sheriff's Office never actually filed a police report because, in the main lobby of the Sheriff's Office where the Plaintiff was giving his testimony to one of the Sheriff's deputies – with several other Sheriff's Office personnel serving as eye-witnesses to such events – a group of Orange County Sheriff's Office deputies produced a counterfeit, illegal, and illegitimate Involuntary Commitment affidavit (violating **NC G.S. 122C-281, NC GS § 1-607(a)(2), and 18 U.S. Code § 473 - Dealing in Counterfeit Obligations or Securities)** against the Plaintiff on 01/14/15 at approximately 5:30 PM EST and immediately placed the Plaintiff in handcuffs and confiscated his belongings (**depriving the Plaintiff of liberty and property without due process of law**). Note, Please note that at absolutely no time before, during, or after his visit to the Sheriff's Office did the Plaintiff show signs of either

4

dangerousness to self, as defined in **NC G.S. 122C-3(11)a**, or dangerousness to others as defined in **NC G.S. 122C-3(11)b.**

16. Deputy Huffman was the law enforcement official who was acting under the color of state law when he abducted the Plaintiff from the Orange County Sheriff's Office and brought him to the UNC Medical Center (on 01/14/15) under the guise of illegitimate court documents (counterfeit Involuntary Commitment affidavit). The execution of illegitimate Involuntary Commitment affidavit in turn deprived the **Plaintiff of liberty and property**, and thus, the Orange County Sheriff's Office and personnel from the UNC Medical Center violated **Due Process of Law, as expressed in the 5th and 14th Amendments to the US Constitution.**

17. The Involuntary Commitment affidavit lacked a notarization and/or seal and the legitimacy of the judge's or magistrate's signature is quite questionable. There is a fairly large number of people (including Deputy Huffman) who should be legally liable under **NC GS § 122C-204.**

18. Initially, the Plaintiff was assigned a bed in the normal medical emergency room and was examined by a resident medical doctor named Dr. Carley Bria. Soon, another medical doctor named Dr. Christopher L. Howarth came and evaluated the Plaintiff. Then, a resident psychiatrist named Dr. Brian Casey conducted an evaluation of the Plaintiff and then went to speak with his attending Dr. Ronit J. Dedesma – a physician who gave the order to (illegally) admit the Plaintiff into the inpatient unit on 01/14/15.

19. Soon, the Plaintiff was forced by the hospital faculty and security staff to change locations so that he would enter and be kept in the psychiatric emergency room (directly next to the original bed the Plaintiff received his evaluations from Dr. Carley Bria, Dr. Christopher Howarth, and Dr. Brian Casey) where he was held overnight (with two other male Caucasian patients as eyewitnesses).

20. On 01/14/15, the Plaintiff was illegally admitted to the inpatient unit in the UNC Medical Center with the use of an illegitimate Involuntary Commitment affidavit (produced by the Orange County Sheriff's Office) submitted to the UNC Medical Center. The next day (01/15/15) the Plaintiff was transferred to another emergency room unit. In this new unit, the medical staff including many psychiatrists violated **NC GS § 122C-266** – by being involved in holding the patient in the second psychiatric emergency unit for an additional 3 days after the initial 01/14/15 illegal admission, when by law, a patient of Involuntary Commitment status must be evaluated by a psychiatrist within 24 hours of being taken into police custody. Based upon the psychiatrist's evaluation, the patient must either be discharged from the hospital, become placed on Outpatient Commitment, or become admitted into an inpatient unit.

21. The Plaintiff was instead left stranded in another psychiatric emergency room where Dr. Angela K. Strain visited the Plaintiff on 01/15/15 and pretended to evaluate the Plaintiff when all she was doing was conducting a 'show' evaluation in which the truth about the Plaintiff's responses were covered up when Dr. Angela K. Strain falsified the Plaintiff's medical records – thereby committing healthcare fraud. Dr. Angela K. Strain also

5

maliciously planned to make the Plaintiff stay in the hospital for as long as possible (so he would not be physically able to notify law enforcement of the criminal activities which began on 02/26/13 and again manifested on 01/14/15) – crimes in which Dr. Angela Strain was directly involved in committing(including the destruction of the original 02/26/13 Voluntary Commitment documentation and illegal admission of the Plaintiff into the inpatient unit of the North Carolina Neurosciences Hospital on 02/26/13.

22. One of the patients in the secondary emergency room notified the Plaintiff that he was an undercover FBI agent. The Plaintiff showed the so-called "uncover FBI agent" a copy of the 01/14/15 Involuntary Commitment affidavit (provided to the Plaintiff upon request by the Patient Relations department at the UNC Medical Center). The affidavit lacked a seal and/or notarization (making it illegitimate) – yet this fact was ignored by the hospital staff and law enforcement.

23. During one of the days while the Plaintiff was kept in a second psychiatric emergency room sometime soon on and after 01/15/15, he notified a hospital police officer about illegal and criminal activities that occurred at the UNC Medical Center between 02/26/13 – 03/04/13. The police officer took down several notes and names of physicians who carried out criminal activity. The police officer then stated that he was going to look into the matter and then left the second psychiatric emergency room unit. At first, the Plaintiff assumed that the hospital police officer was going to carry out an investigation, yet in reality the police officer acted to coverup the criminal information the Plaintiff had informed him about. The officer never conducted an investigation or file an official police report.

24. There are several physicians listed in the Plaintiff's medical records including Dr. Elizabeth Upton, Dr. William Matthews, Dr. Desmina A. Friday, Dr. Robyn A. Jordan, Dr. Nicole Jacobs, Dr. Robin M. Reed, Dr. Sarah Schmitz, Dr. Neil Naik, Dr. Ling-Chun Lu, Dr. Jennifer M. Richards, Dr. Jaydeep J. Lamba, Dr. Julia S. Knerr, Dr. Nathaniel Sowa, Dr. Karen A. Graham, Dr. Brian T. Bramson, and Dr. James L. Larson) who stated they were part of the Plaintiff's treating physicians, when in reality the Plaintiff has never met any of these doctors during any time during his stay at the hospital between 01/14/15 – 02/12/15.

25. The Plaintiff spent most of his time in the very same psychiatric ward (inside the North Carolina Neurosciences Hospital) with the very same attending psychiatrist (Dr. Kenan M. Penaskovic) as had been previously assigned to the Plaintiff during the 02/26/13 – 03/04/13 abduction/kidnapping episode at the UNC Medical Center. It can be insinuated that Dr. Penaskovic organized and planned to have the Plaintiff become Penaskovic's patient again. This was done perhaps to entice a larger bill that the Plaintiff would be forced to pay out of pocket to pay for Penaskovic's treatment, or perhaps to try and pry information out of the Plaintiff about what he said at the Orange County Sheriff's Office on 01/14/15 – by holding the Plaintiff in the hospital for as long as possible.

26. Dr. Alicia Watson acted in coordinated with Dr. Kenan M. Penaskovic in torturing the Plaintiff and committed healthcare fraud by falsifying statements made in the Plaintiff's official medical record. Dr. Watson often refused to give the Plaintiff his daily psychiatric evaluation – often storming out of the Plaintiff's bedroom in an attempt to cover-up the

6

Plaintiff's testimony about the many criminal activities that were involved with the Plaintiff's admission and hospitalization.

27. Karen Murphy, the Plaintiff's hospital-appointed attorney, acknowledged that the 01/14/15 Involuntary Commitment affidavit that the Orange County Sheriff's Office provided was not legitimate. A few days later, Murphy added a second illegitimate Involuntary Commitment affidavit (signed by Dr. Alicia Watson on 02/03/15) into the Plaintiff's medical records binder located in the nurse's station of the psychiatric ward, to cover up the fact that illegal activity had occurred with regard to the Orange County Sheriff's Office initial 01/14/15 Involuntary Commitment affidavit (which violated **NC G.S. Section 122C-281**).

28. Serving as an illegitimate (and late) post-deprivation process for the Plaintiff, a court hearing was held **after** the legally mandated 10 calendar day maximum time limit (**NC G.S. Section 122C-268**) after the Plaintiff was taken into custody by law enforcement on 01/14/15. The Plaintiff's district court hearing was delayed because both UNC Medical Center and Orange County Sheriff's Office personnel were heavily involved in trying to coverup the 01/14/15 so-called "Involuntary Commitment" affidavit by replacing it with another illegitimate Involuntary Commitment affidavit petitioned by Dr. Alicia Watson on 02/03/15.

29. Please note that the 01/14/15 Involuntary Commitment documentation was hidden from the judge's file during the Plaintiff's court hearing for his Involuntary Commitment status at the UNC Medical Center in 2015. The second illegitimate Involuntary Commitment affidavit (signed by Dr. Alicia Watson) was instead used in its place and was referred to during for the majority of the court hearing until finally towards the end, the Plaintiff brought up the fact that he was originally placed under Involuntary Commitment on 01/14/15 (and not on the date that Dr. Alicia Watson's documentation was filed). The judge was astonished and started to ask questions, so Karen Murphy hesitantly and defiantly furnished the judge with a copy of the initial 01/14/15 affidavit which the judge stated that he thought that there may have been some inaccuracies with the documentation itself (by lacking a mandatory seal and/or notarization, for example). Nevertheless, the judge told the Plaintiff that he was going to let the illegitimate 01/14/15 Involuntary Commitment affidavit "pass". The Plaintiff was ordered by the judge to remain under Involuntary Commitment status for observation for an additional 2 weeks.

30. The Plaintiff was handed a subpoena by a law enforcement officer during one of his very last days in hospital (second week of February, 2015) to go to a court hearing regarding the terrorism investigation that the Orange County Sheriff's Office initiated based off of false and fraudulent claims of some Orange County Sheriff's Office personnel, which were uttered in an attempt to coverup and hide both the Plaintiff's abduction by Deputy Huffman and the illegitimate and counterfeit Involuntary Commitment affidavit produced by the Sheriff's deputies on 01/14/15. The Plaintiff's UNC hospital-appointed lawyer, Karen Murphy, later came into the psychiatric ward and told the Plaintiff that he did not have to appear the court hearing that he was just subpoenaed for by law enforcement. The court date was scheduled to be on the docket on 02/13/15. It is questionable why the court date was cancelled (and how and/or why it became part of the court docket in the first place) even after subpoenas were issued.

7

31. The Plaintiff was illegally diagnosed with paranoid schizophrenia by Dr. Kenan M. Penaskovic. To legally diagnose someone with schizophrenia, the patient must be continuously evaluated by a psychiatrist for schizophrenic symptoms for a time period of at least 6 months. Dr. Penaskovic however, broke the law when he diagnosed the Plaintiff with paranoid schizophrenia after an evaluation of only roughly 2 weeks. In reality, Penaskovic was corruptly trying to prevent the Plaintiff from passing even more FBI/ATF/Cumberland County Sheriff's Office background checks to legally purchase firearms – since all the Involuntary Commitment and Outpatient Commitment documentation was not bound by the power of law (because they were illegitimate) and therefore the Plaintiff would have been able to pass even more government mandated background checks to legally obtain firearms. Therefore, the Plaintiff could have easily purchased more firearms were it not for the paranoid schizophrenia diagnosis – which bars anyone diagnosed with this illness from passing the federally-regulated background checks when attempting to purchase firearms.

32. The Plaintiff was discharged from the UNC Medical Center on 02/12/15. The Plaintiff received several months of Outpatient Commitment follow-up treatment by Dr. Kenneth Fleishman in Fayetteville, North Carolina. Eventually, the Carolina Outreach Fayetteville Assertive Community Treatment (ACT) team took over care of the Plaintiff.

33. After a series of evaluations and other diagnostic media were exhausted, the Plaintiff was diagnosed with Post Traumatic Stress Disorder (PTSD) as a direct result of the trauma and psychological suffering that he encountered at the hospital. The Plaintiff received intensive PTSD treatment by Andrew Hile, a licensed clinical social worker for the Carolina Outreach Fayetteville Assertive Community Treatment (ACT) team. After moving away from Fayetteville to live in Durham, North Carolina, the Plaintiff was under the treatment of the Carolina Outreach Durham ACT Team, and was assigned to work with a PTSD therapist named Kuniko Madden for many months. PTSD treatment stopped when Plaintiff moved to start a new job as a contractor for the Department of Defense at Walter Reed National Military Medical Center in Bethesda, Maryland.

34. PTSD treatment was resumed in January 2021 by a B&D Integrated Health Services therapist named Josh Heying, who is working intensively with the Plaintiff so that the psychological trauma of being abducted and hospitalized so many times and under such inhumane conditions does not become a permanent scar within the mindset of the Plaintiff.

35. The costs incurred upon the state for payment for ACT Team services by Carolina Outreach in Fayetteville, North Carolina were initially paid by funds set aside by Cumberland County tax revenue (the costs for treatment were paid by the government). After the Plaintiff started receiving North Carolina Medicaid services in 2017 (which he received through his US Social Security Administration's Disability application approval), the ACT Team services provided by Carolina Outreach (Fayetteville and Durham, NC), and B&D Integrated Health Services, have been paid by the government via the Plaintiff's Medicaid health insurance.

36. Plaintiff filed civil suit 19 CV 9 at the Orange County Clerk of Superior Court on 01/03/19. Plaintiff then paid the Orange County Sheriff's Office $60 as a fee in exchange for the

Sheriff's Office agreeing to serve the 19 CV 9 complaint to the two defendants (Dr. Kenan M. Penaskovic and Dr. Angela K. Strain). Instead of serving the defendants however, the Orange County Sheriff's Office simply destroyed the 19 CV 9 complaint in an attempt to coverup the lawsuit because it contained incriminating information about criminal and illegal activities that the Sheriff's Office was previously engaged in (i.e. bribery and/or retaliating against a victim, witness, or informant).

37. Amanda Bruner of the Orange County Clerk of Superior Court's Office lied to the Plaintiff over a phone-call, stating that the defendants were served on 01/04/19 by law enforcement personnel from the Orange County Sheriff's Office. This is simply not true. There was no response or answer to the Plaintiff's complaint from either defendant, neither was there any default judgement rendered by the court. This is extremely suspicious behavior that makes us question the legitimacy of our own local law enforcement and judiciary systems.

38. On 03/07/19, the Plaintiff wanted to go see his friend in Jackson, Mississippi from Durham, North Carolina, but Plaintiff accidentally put 'Jackson, Missouri' into his GPS by mistake and drove for several hours in the wrong direction. Plaintiff then turned around and drove until he was in Orange County, NC near the exit for Buckhorn Road, and pulled over to the side of the road to take a break from driving. About half an hour later, 3 Orange County Sheriff's deputies' vehicles pulled up behind the Plaintiff's car.

39. The 3 officers and Plaintiff had a frank yet polite discussion, but for some reason the Plaintiff was eventually placed in handcuffs and forcibly driven by one of the 3 deputies to the UNC Medical Center, under an illegitimate, illegal, and counterfeit Involuntary Commitment affidavit (which lacked a seal/notarization) with a forged magistrate's signature – which was produced **after** the Plaintiff was already placed in the psychiatric emergency room. This is a clear violation of **NC G.S. 122C-281**. Please note that at absolutely no time did the Plaintiff show any signs of either dangerousness to self, as defined in **NC G.S. 122C-3(11)a**, or dangerousness to others as defined in **NC G.S. 122C-3(11)b** at any point before, during, or after the hospitalization.

40. While the Plaintiff was held as the only patient at the psychiatric emergency room of the UNC Medical Center for the next 3 days, none of the Plaintiff's medications were administered properly (**violating NC GS § 122C-204(c)**) and there was absolutely no psychiatric evaluation completed by any psychiatrist during any time during the Plaintiff's stay inside the psychiatric emergency room between 03/07/19 – 03/10/19. The only physician that was treating the Plaintiff was an emergency room medical doctor (non-psychiatrist or eligible psychologist) named Dr. Christopher L. Howarth. Howarth was primarily interested in the Plaintiff's elevated hepatic enzyme levels, and therefore he administered an ultrasound of the Plaintiff's liver area on the evening of 03/07/19. Therefore, none of Dr. Howarth's medical evaluations of the Plaintiff were constituted as being evaluated by a commitment examiner (according to **NC G.S. 122C-263(d)(2)**.

41. Seeking justice, the Plaintiff dialed 911 from the patient telephone in the psychiatric emergency room after the psychological torture of the Plaintiff by the faculty/staff and the abuse of power demonstrated by many UNC Medical Center personnel. The Plaintiff

9

repeatedly asked for help to the 911 operator. The hospital police failed to file a proper police report regarding the incident and did nothing to help, despite the fact that so many illegal events were taking place, while the Plaintiff called 911 and begged for salvation.

42. On 03/09/19, the Plaintiff was denied access to use the normal restroom/toilet facilities – and instead was only given the option to defecate/urinate in a poop-bucket/jug, which was to be located in front of security/surveillance cameras as well as in plain sight of other patients and staff in the emergency room – as directed by a male nurse who brought in the actual poop-bucket and placed it in the psychiatric emergency room and instructed the Plaintiff that he was not allowed to use the bathroom anymore except for going inside the poop-bucket. This is **Cruel and Unusual Punishment** outlined by the **8th Amendment to the US Constitution.**

43. By denying the Plaintiff the bare necessity of using the bathroom/toilet as a normal human, and instead placing a poop-bucket in the psychiatric emergency room, goes against all morally righteous and humane senses of decency. By only giving the Plaintiff the option to defecate in a poop-bucket in plain sight of other hospital personnel, the Plaintiff had deep feelings of humiliation, grief, embarrassment, abuse, and neglect which still resonate to this day.

44. On 03/10/19, the Plaintiff tried to escape from the hospital by running out of the locked door when it was opened by hospital staff/faculty, and then subsequently running out into the parking lot – where a nurse vigorously tackled the Plaintiff unto the hard pavement below. This resulted in a deep and bloody wound on the Plaintiff's left forearm.

45. Only after the Plaintiff's attempted escape and subsequent injury, did finally a psychiatrist named Dr. Ronit J. Dedesma arrive at the psychiatric emergency room to interact with her neglected patient. Dr. Dedesma's only communication with the Plaintiff only included the fact that the Plaintiff was going to be transferred (without a psychiatric evaluation, violating **NC G.S. 122C-263(d)(2)**) to Central Regional Hospital, located at 300 Veasey Road, Butner, NC 27509. Note Dedesma did not enter any medical records into the official medical record of the Plaintiff, thereby violating **NC G.S. §122C-263(e), NC G.S. §122C-266(c),** and **NC G.S. 122C-266(e).** This also constitutes fraud according to **NC G.S. § 1-607(a)(2).**

46. Dr. Ronit J. Dedesma made a false record when she transferred the Plaintiff to Central Regional Hospital, one that does not exist in the official record, violating **NC G.S. §122C-263(e),** and the **Health Insurance Portability and Accountability Act of 1996 (HIPAA)** when it comes to entering the Plaintiff's correct protected health information (PHI) into the medical record. Note Dedesma failed to complete an official psychiatric evaluation of the Plaintiff while the Plaintiff was being held in the psychiatric emergency room of the UNC Medical Center, which violated **NC GS 122C-263(c)** and **NC GS 122C-283(c).**

47. Note Plaintiff was never seen by Dr. James Lionel Larson while a patient in the psychiatric emergency room between 03/07/19 – 03/10/19, even though it is indicated as so on the Plaintiff's UNC MyChart records, which stated that Dr. James Larson was one of the Plaintiff's treating physicians/psychiatrists. This was simply not true, as at no moment in

10

time did the Plaintiff have any sort of encounter with Dr. Larson. The Plaintiff was never given an actual psychiatric evaluation while in the psychiatric emergency room. This is just another example of the healthcare fraud that was committed by several personnel at the UNC Medical Center.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: FRAUD AND FRAUDULENT MISREPSENTATION
- Fraudulent misrepresentation exists when he tortfeasor knowingly makes false statements or purposefully behaves in a way as to deceive the victim.
- The defrauder must intend to deceive by making a false representation of material fact.
  - The Involuntary Commitment documentation that was "filed" by Dr. Kenan M. Penaskovic between 02/26/13 – 03/04/13 was meant to deceive the average person and trick them into believing that the Plaintiff really was being held under Involuntary Commitment status, when in reality the Plaintiff signed Voluntary Commitment documentation with Dr. Elizabeth Cox on 02/26/13.
  - The Orange County Sheriff's Office produced a counterfeit Involuntary Commitment affidavit on 01/14/15 – which was meant to deceive and trick the average person into thinking that they had possession of a legitimate court order for Involuntary Commitment with regard to the Plaintiff. Karen Murphy (the Plaintiff's hospital-appointed attorney) agreed that the documentation was not legitimate and therefore went to Dr. Alicia Watson for help.
  - Dr. Alicia Watson signed a counterfeit Involuntary Commitment document on 02/03/15, that was used as a false justification for holding the Plaintiff against his will at the NC Neurosciences Hospital at the UNC Medical Center.
  - On 03/07/19, the Orange County Sheriff's deputies produced a counterfeit Involuntary Commitment affidavit **after** the Plaintiff was already placed into the psychiatric emergency room of the UNC Medical Center. This documentation was used to deceive and trick the average person into thinking that the Plaintiff was under legitimate Involuntary Commitment status, when in reality the counterfeit court documents were intended to trap the Plaintiff in an enclosed and confined space in the hospital and become subject to abusive and inhumane treatment by UNC Medical Center associates.
- The defrauder must know that the statements made are false.
  - Dr. Kenan M. Penaskovic should know the proper procedure for placing someone under Involuntary Commitment status, yet he ignored a Voluntary Commitment document and instead illegally filed that the Plaintiff be placed under Involuntary Commitment status. Penaskovic knew without a doubt that the documentation that he "filed" was done illegitimately. The illegality of Penaskovic's documentation is evident considering the fact that the Plaintiff was able to pass numerous FBI, ATF, and Cumberland County Sheriff's Office background checks which allowed the Plaintiff to legally purchase firearms **after** he was so-called placed under "Involuntary Commitment" between 02/26/13 – 03/04/13.
  - The Orange County Sheriff's deputies involved in producing the 01/14/15 counterfeit Involuntary Commitment affidavit knew wholeheartedly that what

11

they were doing was illegal and counterfeit. Any Sheriff's deputy could and should have simply looked at the cover-page of the affidavit and realize that there was a lack of a seal and/or notarization, which is a key part of the process of producing an otherwise legitimate Involuntary Commitment affidavit. This shows intent to cause harm, because the Sheriff's Office personnel could reasonably have predicted that the Plaintiff would be held (illegally) against his will by use of the counterfeit Involuntary Commitment affidavit that they were involved in producing.

o The Orange County Sheriff's deputies involved in producing the 03/07/19 counterfeit and illegitimate Involuntary Commitment affidavit knew wholeheartedly that what they were doing was illegal. The Orange County Sheriff's Office personnel even forged either a judge's or magistrate's signature on the affidavit, and then failed to get the documentation properly sealed and/or notarized by the proper authority. This shows intent to cause harm, because the Sheriff's Office personnel could reasonably have predicted that the Plaintiff would be held (illegally) against his will by use of the counterfeit Involuntary Commitment affidavit they were directly involved in producing.

o Much of the physicians' staff knew about the fraudulent Involuntary Commitment affidavit, yet they failed to act to ameliorate the situation. Instead, psychiatrists such as Ronit J. Dedesma and Julia S. Knerr knew the commitment documentation was fraudulent – yet they continued in their inhumane treatment of the Plaintiff.

- The purpose of the false statements must be to entice the victim into giving the tortfeasor something of value.

  o The destruction of the Plaintiff's Voluntary Commitment documentation (signed by the Plaintiff on 02/26/13) made sure that the Plaintiff would be held in the hospital for as long as possible, amassing a large bill that amounted to over $10,000 in value. Please note, the hospital committed insurance fraud by not filing the Plaintiff's Blue Cross Blue Shield of North Carolina health insurance information so that the insurance would be billed for the length of the Plaintiff's stay at the hospital. The bill from UNC Hospitals eventually went to a collections agency and still has not been paid to this very day.

  o The physicians and nursing staff had an interest in keeping the Plaintiff in the hospital for as long as possible because the longer the Plaintiff remained hospitalized, the more money each staff/faculty member would accumulate, during all 3 episodes of abduction/kidnapping at the UNC Medical Center.

  o The use of the 01/14/15 counterfeit affidavit was used as just reason for the UNC Medical Center's inhumane treatment of the Plaintiff between 01/14/15 – 02/12/15.

  o The use of the 03/07/19 counterfeit affidavit was used as just reason for the UNC Medical Center's inhumane treatment of the Plaintiff 03/07/19 – 03/10/19. The physician and nursing staff accumulated a large sum of money while the Plaintiff was billed over $1000 for each day he spent at the UNC Medical Center in 2019. Therefore, the counterfeit Involuntary Commitment documents were used as a fraudulent means to collect money at the expense of the Plaintiff's suffering.

12

- Defendant's intention to induce the Plaintiff to act or to refrain from acting in reliance upon the misrepresentation;
  - o The 03/07/19 counterfeit Involuntary Commitment affidavit applied to the Plaintiff regardless of the fact that it was fake. Many faculty/staff knew about the illegitimacy of the affidavit, but they did not want to expose the truth behind the counterfeit documentation produced by the Sheriff's deputies. This counterfeit Involuntary Commitment affidavit was executed in such a way that the Plaintiff became deprived of liberty, as the Plaintiff was forcibly confined inside a small and locked hospital unit which did not allow the Plaintiff freedom of movement, thought, or expression. All of this was deemed appropriate by faculty/staff because the Sheriff's deputies submitted an Involuntary Commitment affidavit without anyone inspecting it for legitimacy.
  - o Between 03/07/19 – 03/10/19 the counterfeit court documents "filed" by the Orange County Sheriff's Office deputies were used as a fraudulent justification for keeping the Plaintiff in the hospital against his will. The Plaintiff had no choice but to comply with law enforcement and hospital staff (under duress) as the Involuntary Commitment status, fabricated by the Orange County Sheriff's Office, completely took control of the Plaintiff's mood, behavior, and actions for the entirety of the Plaintiff's hospitalization and its aftermath.
- The innocent party must justifiably rely on the misrepresentation.
  - o The Plaintiff had no choice but to adhere (under duress) to his Involuntary Commitment status which began on 01/14/15 and lasted all the way until 02/12/15 by the use of the fraudulent misrepresentation the Sheriff's deputies produced in the form of a counterfeit Involuntary Commitment affidavit. The Plaintiff was also held against his will be a second Involuntary Commitment affidavit that was signed by Dr. Alicia Watson while the Plaintiff was being held at the NC Neurosciences Hospital. The misrepresentation was used as a means to hold the Plaintiff in the hospital against his will while an illegitimate terrorism investigation was being conducted by personnel from the Orange County Sheriff's Office.
  - o The Plaintiff was given no choice but to listen to law enforcement and hospital personnel (under duress) with all of the illegitimate and illegal activities that began to occur on 03/07/19, starting with the abduction from the road and subsequent kidnapping to the UNC Medical Center in Chapel Hill, North Carolina. Otherwise, drastic measures could have been taken by the Orange County Sheriff's Office deputies and UNC Medical Center personnel, which would make for a completely unmanageable and even more horrific experience by the Plaintiff.
  - o Many faculty/staff at the hospital assumed that the Involuntary Commitment affidavit was legitimate, readying them to unveil a plethora of measures which restricted the Plaintiff's freedoms – which led to further detrimental degradation of the Plaintiff's quality of life. The Plaintiff's PTSD symptoms were immensely negatively affected because the Plaintiff was held against his will (while not being allowed to use a normal bathroom) at the psychiatric emergency room at the UNC Medical Center between 03/07/19 – 03/10/19.

13

- o Many faculty/staff at the hospital knew that the Involuntary Commitment affidavit was counterfeit, yet they did not do anything to let the proper authorities know. The hospital staff in turn, restricted the Plaintiff's freedoms – which led to a further detrimental degradation of the Plaintiff's quality of life. The Plaintiff was held under inhumane conditions while the majority of the hospital staff ignored the fact that the Involuntary Commitment documentation was submitted **after** the Plaintiff was admitted to the psychiatric emergency room – violating **NC GS § 122C-204 (**

- The innocent party must be injured.
  - o The Plaintiff has experienced an extreme amount of psychological and mental suffering directly attributable to his abductions in 2013, 2015, and 2019 when the Plaintiff was illegally admitted to the UNC Medical Center and was tortured in a confined space via the use of counterfeit court documents. The Plaintiff suffered so much that he was diagnosed with Post Traumatic Stress Disorder (PTSD), which makes him significantly suffer throughout the day, every-day.
  - o Intensive PTSD therapy techniques had to be undertaken by B&D Integrated Health Services ACT Team therapist Josh Heying (who is currently the patient's PTSD therapist) in order to try and treat the Plaintiff's severe case of PTSD.
  - o **Please see Exhibit 1**
  - o Dr. Kenan M. Penaskovic and Dr. Alicia Watson tortured the Plaintiff by refusing to discharge the Plaintiff even though the Plaintiff did not meet Involuntary Commitment criteria between 01/14/15 – 02/12/15.. In addition, the treating psychiatrists forced medications on the Plaintiff, such as the drug Zyprexa, which at night, made the Plaintiff continuously kick and shake his legs as well as made the Plaintiff feel like his breathing was shutting down while he was having severe chest pains.
  - o Many faculty/staff at the hospital assumed that the Involuntary Commitment affidavit was legitimate, readying them to unveil a plethora of measures which restricted the Plaintiff's freedoms and led to a further detrimental degradation of the Plaintiff's quality of life. The Plaintiff's PTSD symptoms were immensely affected because the Plaintiff was held against his will (while not being allowed to use a normal bathroom) at the psychiatric emergency room at the UNC Medical Center between 03/07/19 – 03/10/19, before being transferred to Central Regional Hospital where the Plaintiff was illegally held for approximately 1 month. New and intensive PTSD therapy techniques had to be undertaken by B&D Integrated Health Services ACT Team therapist Josh Heying (who is currently the patient's PTSD therapist) in order to try and treat the Plaintiff's severe case of PTSD.

## SECOND CAUSE OF ACTION: BREACH OF CONTRACT
- Plaintiff entered into a contract with the seller and other Defendants in good faith under laws governed by the North Carolina Medical Board, The American Medical Association, the North Carolina Medical Practice Act, and the HIPPA Act of 1996 govern many of the rules, laws, and regulations within the healthcare industry.
- This shows that the treating physicians and nursing staff owed the Plaintiff a fiduciary duty to act in the Plaintiff's best interests while administering their medical and/or psychiatric treatments. Instead, associates of UNC Hospitals psychologically tortured the Plaintiff

14

(according to the UN Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment) while he was held against his will, trapped in a very uncomfortable confined space for an indefinite period of time on 3 separate occasions.

- Psychiatrists such as Dr. Penaskovic, Dr. Dedesma, Dr. Strain, and others exhibited a manner of care that was well below the normal standard of care – as these individuals were intentionally involved with counterfeit Involuntary Commitment affidavits.

## THIRD CAUSE OF ACTION: FALSE ARREST

- False arrest is the unlawful restraint of a person's freedom of moment. It can occur any time one person:
  - ○ Holds another individual against his or her will or
  - ○ Takes another individual into custody without consent or without legal justification to do so.
- To prove False Arrest, the Plaintiff must show that:
  - ○ The person they're suing for false arrest (the Defendant) intended to confine the Plaintiff
    - ▪ The Orange County Sheriff's deputies, after having a polite conversation with the Plaintiff on the side of the road, suddenly placed the Plaintiff in handcuffs and then forced him in into the back of one of the 3 cruisers parked behind the Plaintiff's car on I-40. The Plaintiff was then told he was going to be taken to the UNC Medical Center (even though the Sheriff's deputies had no custody order or Involuntary Commitment affidavit to legitimize this 3rd abduction to UNC hospitals). After arriving at the hospital, one or more Sheriff's deputies produced a counterfeit Involuntary Commitment affidavit with a forged magistrate's signature – which was used to hold the Plaintiff against his will in a small locked psychiatric unit at the UNC Medical Center emergency room.
    - ▪ The Sheriff's deputies who were involved in the production of the counterfeit affidavit did so with the intention that the Plaintiff be confined inside of the hospital under the guise of fake court documents.
  - ○ The Plaintiff was conscious of the confinement
    - ▪ The Plaintiff asserts that he felt every confining aspect of riding handcuffed in the backseat of an Orange County Sheriff's deputy's police car. Once at the UNC Medical Center, the Plaintiff was placed in a one-way locking door unit which locked the Plaintiff into a confined chamber (the psychiatric emergency room) which the Plaintiff did not effectively leave until he was illegitimately transferred to Central Regional Hospital on 03/10/19 after trying to escape and sustaining the resulting personal injury.
  - ○ The Plaintiff did not consent to the confinement
    - ▪ The Plaintiff contested the actions of the Orange County Sheriff's deputies immediately after they placed the Plaintiff in handcuffs and forced him into the back of one of the police cruisers.
    - ▪ The Plaintiff called 911 from the hospital patient telephone, an act which probably saved his life by alerting tertiary law enforcement about illegal activities occurring at UNC Hospitals emergency room. Were it not for the Plaintiff's discontent feelings toward his confinement, he would not have

15

dialed 911 from the patient telephone in an attempt to notify law enforcement of his abduction/kidnapping. Please be aware that the situation must to have been dire if the Plaintiff had to resort to calling the Chapel Hill Police Department in order to resolve a series of issues perpetrated by law enforcement and hospital staff.
- o The confinement was not otherwise privileged.

## FOURTH CAUSE OF ACTION: FALSE IMPRISONMENT (NC G.S. § 1-54(3))

- Between 02/26/13 – 03/04/13, the Plaintiff was held against his will at the NC Neurosciences Hospital with the use of illegitimate Involuntary Commitment documentation. The Plaintiff was confined to a very small area (with access to only his bedroom, day-room, and group room), where he was deprived of liberty and property without due process of law; this a violation of the 5th and 14th Amendments to the US Constitution – as the Plaintiff was never given a court hearing for his so-called "Involuntary Commitment" status that was put in place by Dr. Kenan M. Penaskovic, violating **NC GS § 122C-204.**
- The Orange County Sheriff's deputies, after having a polite conversation with the Plaintiff on the side of the road, suddenly placed the Plaintiff in handcuffs and then forced him in into the back of one of the 3 police vehicles parked behind the Plaintiff's car on I-40. The Plaintiff was then told he was going to be taken to the UNC Medical Center (even though the Sheriff's deputies had no custody order or Involuntary Commitment affidavit to legitimize this 3rd abduction to UNC hospitals). After arriving at the hospital, one or more Sheriff's deputies produced a counterfeit Involuntary Commitment affidavit with a forged magistrate's signature – which was used to hold the Plaintiff against his will in a small locked psychiatric unit at the UNC Medical Center emergency room.
- The Plaintiff asserts that he felt every confining aspects of riding handcuffed in the backseat of an Orange County Sheriff's deputy's cruiser. Once at the UNC Medical Center, the Plaintiff was placed in a one-way locked door mechanism which locked the Plaintiff into a confined chamber (the psychiatric emergency room) which he was not allowed to leave until he was illegitimately transferred to Central Regional Hospital on 03/10/19, where he was illegitimately held against his will until his discharge on 04/18/19.

## FIFTH CAUSE OF ACTION: MEDICAL MALPRACTICE

1. The medical care administered to the Plaintiff violated standards and laws set forth by the United States Department of Health and Human Services as found in **NC G.S. 90-21.11(2)a & NC G.S. 90-21.12.**
2. Establish Doctor-Patient relationship
3. Show breach of contract/duty, which is proved by shown that the physician affirmatively did something or neglected to do something and fell below the standard of care owed to the patient.
   a. Dr. Ronit J. Dedesma failed to administer a psychiatric evaluation of the Plaintiff while he was being held in the hospital between 03/07/19 – 03/10/19. This was in violation of **NC GS § 122C-263(c).**
   b. Dr. Dedesma was also responsible for not administering the Plaintiff's medications properly, and as a result the Plaintiff experienced severe mental anguish and anxiety. Dedesma's actions fell well below the standard of care

16

normally exercised by normal physicians, who properly administer their patients' medications.

    c. Dr. Dedesma is also the individual who instructed her fellow employees and n nursing staff to not to let the Plaintiff use the normal patient toilet and instead insisted that the Plaintiff be allowed only to use a poop-bucket. This fell well below the standard of care exercised by normal physicians and nursing personnel.

4. Element of causation is needed to show that it was the physician's acts or omissions that actually caused the harm the Plaintiff suffered

    a. Were it not for the UNC Medical Center staff relying on fraudulent Involuntary Commitment documents in order to hold the Plaintiff in a confined space, the Plaintiff would not have felt so isolated and terrified, fearing that retaliatory motives by Dr. O'barr, Dr. Penaskovic, Dr. Strain, Dr. Watson, and others would target the Plaintiff in a detrimental way. Because the Plaintiff was held against his will, he felt completely traumatized and mortified. It was directly because of the restrictive maneuvers that were put in place by UNC Medical Center personnel that the Plaintiff felt terrified, anguish, disgust, degradation, among other negative feelings.

    b. Because several physicians knew that the 2013, 2015, and 2019 Involuntary Commitment documentation was illegal – therefore these same physicians took measures to coverup the fact that the Plaintiff was abducted/kidnapped.

    c. Please see **Exhibit 1.**

5. Damages

    a. As a direct result of the actions of UNC Medical Center personnel in 2013, 2015, and 2019, including the fact that they were directly involved in the abduction/kidnapping and confinement of the Plaintiff at the hospital on 3 separate occasions. The Plaintiff was traumatized so much after being held under Involuntary Commitment status that he was diagnosed with Post Traumatic Stress Disorder (PTSD).

    b. Please see **Exhibit 1.**

    c. Medical bills billed out-of-pocket for the Plaintiff were illegitimate because during the 2013 hospitalization, the Plaintiff possessed Blue Cross Blue Sheild of North Carolina health insurance, which was never filed with the hospital. The Plaintiff was induced to pay approximately $13,000 for services rendered by the hospital between 02/26/13 – 03/04/13.

    d. The Plaintiff's psychological well-being was detrimentally impacted to such a degree that it required subsequent repeated inpatient long-term hospitalizations at medical facilities throughout the state of North Carolina.


## SIXTH CAUSE OF ACTION: INTENTIONAL AFFLICTION OF EMOTIONAL DISTRESS

- Intentional infliction of emotional distress consists of 3 elements:
  - 1) Outrageous conduct by the tortfeasor
    - The UNC Medical Center, on three occasions (01/14/15, 01/14/15, and 03/07/19), dealt with counterfeit Involuntary Commitment affidavits that

17

were used to confine the Plaintiff against his will for an indefinite period of time.

- During the 03/07/19 – 03/10/19 episode, none of the Plaintiffs medications were administered properly, leading to an increased mental suffering and psychological torment by the Plaintiff, as the Plaintiff requires his clonazepam for his chronic anxiety,
- Note the denial by the physicians/nursing staff of the Plaintiff's basic right to use to the patient bathroom. Instead, a poop-bucket was brought into the unit on 03/10/19 by a male nurse who instructed the Plaintiff that the only way he was going to able to defecate or urinate was by using the poop-bucket (which was located in front of security cameras and in the plain view of other hospital personnel and patients in the medical emergency room). This is simply disgusting and barbaric.

o   2) Conduct intended to cause severe mental anguish in the victim

- The intent for the Orange County Sheriff's deputies for producing a counterfeit Involuntary Commitment affidavit on 01/14/15 was to abduct the Plaintiff from the Sheriff's Office and bring him to the UNC Medical Center, where he would be held indefinitely. The intentions of a handful of UNC Medical Center personnel was also to confine the Plaintiff against his will so that he would not be able to further testify against UNC Medical Center personnel and Orange County Sheriff's deputies for their wrongdoing.
- By producing a fake Involuntary Commitment affidavit on 03/07/19, the Orange County Sheriff's deputies on 03/07/19 intended to do everything in their power to hold the Plaintiff against his will in a confined for an indefinite period of time. The Sheriff's deputies used counterfeit court documents to abduct and admit the Plaintiff into the hospital's psychiatric emergency room without any valid reason besides the fact that the deputies meant to retaliate against the Plaintiff because he could later testify that both Orange County Sheriff's Office personnel and UNC Medical Center staff intentionally broke the law in order to target the Plaintiff by making him suffer as much as possible. This suffering directly attributed to the Plaintiff's PTSD symptoms.

o   3) The victim's suffering of severe mental anguish as a consequence of the tortfeasor's behavior

- Plaintiff started receiving PTSD treatment in Fayetteville, North Carolina in early 2017, after suffering for many years without treatment for symptoms that began immediately after the Plaintiff was discharged on 03/04/13.
- The criminal act of abducting the Plaintiff from the Orange County Sheriff's Office on 01/14/15 and from the side of the road on 03/07/19 and bringing him to the UNC Medical Center resulted in the Plaintiff's PTSD symptoms worsening as a direct result of these actions.
- The Plaintiff still feels degraded and suffers from psychological anguish because of the fact that he was denied access to the patient toilet on

18

03/10/19 and instead was given a poop-bucket to defecate/urinate in. This was inhumane treatment that cannot go unnoticed.
- ▪ **Please see Exhibit 1**

## SEVENTH CAUSE OF ACTION: ASSAULT AND BATTERY

- On 03/10/19 when the Plaintiff tried to escape from the psychiatric emergency room, the nurse who ran after the Plaintiff acted with the intention of doing anything and everything in the nurse's power to stop the Plaintiff from gaining more ground and/or running away. As a result, the nurse did not care about the repercussions of his violent actions when he vigorously tackled the Plaintiff and brought him crashing down unto the hard concrete pavement on the floor of the parking lot below. This resulted in a deep and bloody wound on the Plaintiff's left forearm.
- The nurse who tackled the Plaintiff in the parking lot (which resulted in a deep and bloody wound on the Plaintiff's left forearm) acted with the intention of making harmful or offensive (and unwanted) contact with the Plaintiff.

## EIGTH CAUSE OF ACTION: CONSTITUTIONAL RIGHTS VIOLATIONS

- **The 1st Amendment** of the US Constitution was violated on approximately 03/08/19, when UNC Hospitals faulty/staff barred the Plaintiff from using the patient telephone because they were concerned that the Plaintiff might report the situation to law enforcement and/or receive help to escape his illegal incarceration. The Plaintiff's right to freedom of speech was violated because no one allowed the Plaintiff to use the phone to even call his elderly and sick mother and father, who were bewildered by the situation so much so that the Plaintiff asserts that his whole nuclear family has undergone severe trauma as a direct result of the Plaintiff's abductions to the hospital.
- **4th Amendment to the US Constitution was violated:**
    - o *"The right of the people to be secure in their persons, **houses**, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, **supported by Oath or affirmation,** and particularly describing the place to be searched, and the persons or things to be seized."*
    - o The "Oath or affirmation" of the Involuntary Commitment affidavit (01/14/15) was either done illegally and/or not completed at all.
- **The 5th Amendment** of the United States Constitution guarantees that the citizen is to be allowed the Due Process of law when there is a deprivation of life, liberty, or property.
    - o A district court hearing is supposed to be scheduled within 10 calendar days of being placed under Involuntary Commitment status so that the patient has an opportunity to contest others' assertions that further inpatient commitment is needed for stabilization. The Plaintiff was not administered the legally-mandated district court proceeding that every legitimate Involuntary Commitment patient is guaranteed to receive under the law – because the Orange County Sheriff's Office, UNC Hospitals, and Central Regional Hospital all worked to coverup the illegitimacy of the 03/07/19 counterfeit Involuntary Commitment affidavit. Instead, the Plaintiff was afforded a district court hearing 10 days after admission to Central Regional Hospital (without taking into consideration the 3-4 days spent

19

locked in the psychiatric emergency room at the UNC Medical Center before the transfer to Central Regional Hospital.

- **Due Process Clause of the 5ᵗʰ Amendment to the US Constitution:**
  - ○ *Asserts that no person shall "be deprived of life, liberty, or property, without due process of law."*
  - ○ Applies more to federal government actions.
- **The 14ᵗʰ Amendment** of the United States Constitution states "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
  - ○ **Equal Protection Clause of the 14ᵗʰ Amendment**
    - ▪ The law was not applied equally nor in a proportionate manner as the Plaintiff was continuously targeted beginning 02/26/13 at UNC Medical Center. There was an evil hatred in both UNC Hospitals personnel and Orange County Sheriff's associates – hatred that led them to forge court documents for the sake of kidnapping an innocent citizen who did nothing wrong. Personnel in and around Chapel Hill, NC tried their hardest to cover-up the scandal so that adequate law enforcement could not properly investigate the criminal activities that occurred.
    - ▪ Equal protection under the law means that all legitimate laws will be enforced upon each individual in society equally and without discrimination or bias. In the Plaintiff's case however, many laws were violated so that other illegal events could and/or would occur.
    - ▪ For example, the 01/14/15 illegal Involuntary Commitment affidavit illegally forged by the Orange County Sheriff's deputies was an event where the officers involved in the production of the affidavit knew they were breaking from established protocol, regulations, and procedures (because modern law enforcement is trained to deal with custody orders, including standard and routine Involuntary Commitment procedures). Right before Deputy Huffman signed on the Involuntary Commitment affidavit on 01/14/15, an affidavit which lacked any seal and/or notarization (which is an immediate indicator that the documentation was incomplete/illegitimate), Deputy Huffman had a chance to reverse his illegal actions because he knew the Involuntary Commitment affidavit was counterfeit. The Plaintiff was not given his constitutionally guaranteed equal protection of the law (according to the Equal Protection Clause of the 14ᵗʰ Amendment) because a reasonable law enforcement officer would and should refuse to engage in legally illicit behavior, a stark contrast to the criminal activities the Orange County Sheriff's Office participated in which led to the production of illegal court documents and the Plaintiff's subsequent abduction on 01/14/15. The Orange County Sheriff's office deputies intentionally engaged in producing and using the counterfeit Involuntary Commitment affidavit which led to damages caused to the Plaintiff which manifests in his Post Traumatic Stress Disorder symptoms. The actions of the Orange County Sheriff's Office directly impacted the

psychological well-being of the Plaintiff, permanently altering his state of mind in such a fashion that the Plaintiff still has nightmares about Dr. Kenan M. Penaskovic torturing him, as well as being illegally detained in an insane asylum. These nightmares affect the Plaintiff so much so that the Plaintiff now has an inherent fear of any and every hospital and/or physician in North Carolina – due to the fact that so many doctors, nurses, and other hospital staff treated the Plaintiff in an inhumane manner.

   ▪ The Equal Protection Clause was violated on 03/07/19 because unlike the Plaintiff's case, normal people who are simply resting from driving on the road were not randomly placed and handcuffs by law enforcement, forced in the back of a police vehicle, transported to a hospital's psychiatric emergency room with the use of a counterfeit Involuntary Commitment affidavit, and then held under false pretenses for a severely long period of time in false imprisonment, all while healthcare fraud was committed within the Plaintiff's medical records. Usually the Involuntary Commitment affidavits are legitimate when judges and/or magistrates agree to issue them, and not made by counterfeit means. The Plaintiff was not given his constitutionally guaranteed Equal Protection (equal rights) under the law (according to the 14th Amendment) because the law enforcement officers involved in the scandal went out of their way to break the law and cover-up his abduction(s) and their illegitimate Involuntary Commitment affidavits.

- **Due Process** is a fundamental, constitutional guarantee to ensure all legal proceedings will be fair and that a litigant must receive notice of the proceedings and an opportunity to be heard before the government acts to take away one's life, liberty, or property. It is also a constitutional guarantee that a law shall not be unreasonable, arbitrary, or capricious. The constitutional guarantee of due practice of law, found in the Fifth and Fourteenth Amendments to the United States Constitution, prohibits all levels of government from arbitrarily or unfairly depriving individuals of their basic constitutional rights to life liberty, and property.

   o **Procedural due process** "Procedural due process" concerns the procedures that the government must follow before it deprives an individual of life, liberty, or property. Protects individuals from the coercive power of the government by ensuring that adjudication processes, under valid laws, are fair and impartial. Such protections for example, include sufficient and timely notice on why a party is required to appear before a court or other administrative body, the right to impartial trier of fact and trier of law, and the right to give testimony and present relevant evidence at hearings.

- During the 2015 UNC Medical Center Involuntary Commitment court hearing, the Plaintiff was not given a fair chance to share his side of why he believed he should no longer be held in the hospital. The Plaintiff's right to give testimony and present relevant evidence at the hearing was abruptly cut short once the judge/magistrate found out that the Involuntary Commitment document that he based his judgements on was the second set of illegitimate Involuntary Commitment documents (signed by by Dr. Alicia Watson) used to replace the first counterfeit Involuntary Commitment affidavit forged by associates of the Orange County Sheriff's Office on 01/14/15, a copy of which was given

21

to the judge by Karen Murphy (the Plaintiff's hospital-appointed attorney). The Plaintiff pointed out to the judge/magistrate that the 01/14/15 affidavit lacked a seal and/or notarization (making it incomplete and illegitimate). The judge/magistrate said that he was going to "let it pass", meaning that he was going to ignore the flaw(s) of the 01/14/15 Involuntary Commitment affidavit.

## TENTH CAUSE OF ACTION: PERSONAL INJURY

- Presence of a duty
  - o UNC Medical Center personnel entered into a binding contract with the Plaintiff as the Plaintiff signed a treatment consent form in 2013, 2015, and 2019.
  - o The staff at the hospital owed the Plaintiff a fiduciary duty to act in the best interests of the Plaintiff while he was to remain a patient at the hospital.
- Breach of the duty
  - o UNC Medical Center personnel breached their duty to correctly treat the patient when they dealt with the counterfeit Involuntary Commitment affidavits that were produced throughout the Plaintiff's stay at the UNC Medical Center.
- An injury for the claimant
  - o The Plaintiff suffered psychological and mental torment during all 3 of his illegal inpatient hospitalizations.
  - o Please see **Exhibit 1**
- Causation of injury
  - o Injury was caused onto the Plaintiff because associates of the UNC Medical Center neglected the Plaintiff's rights and began to abuse normal codes of ethical conduct.

## PRAYERS

### Compensatory Damages

- Please note that the Plaintiff was covered under Blue Cross Blue Shield of North Carolina health insurance, but the insurance was never filed by the UNC Medical Center anytime between 02/26/13 – 03/04/13, so therefore the Plaintiff was erroneously billed out-of-pocket. This was also an instance of insurance fraud.
- An estimated $13,000 was billed out-of-pocket by UNC Hospitals to the Plaintiff to pay for the "treatment" received between 02/26/13 – 03/04/13. This amount went to a collections agency, which ruined the Plaintiff's credit as the Plaintiff has no means to pay off these debts.
- **The Plaintiff requests to the court that the full amount of the 2013 medical bill be paid to the Plaintiff immediately** and in full, so that the Plaintiff can pay the collections agency.

### Hedonic Damages

- Hedonic damages are those damages for the loss of the enjoyment of life or value of life.
- Plaintiff's enjoyment of his life was impeded by his PTSD, which troubles the Plaintiff's thoughts on a daily basis. Were it not for the malicious actions of the Orange County

Sheriff's Office and UNC Hospitals, the Plaintiff claims he would not have suffered to such an enormous degree.

- In addition, the fact that crimes such as bribery, healthcare fraud, kidnapping, assault, etc. occurred at UNC Hospitals which specifically targeted the Plaintiff cannot go unnoticed.
- The Plaintiff still feels psychological duress surrounding the fact that in 2019 he was not allowed to use the normal bathroom, and instead given a poop-bucket which was located directly in front of security cameras and in plain view of other UNC Hospitals staff/patients in the emergency room. This is extremely foul, degrading., and inhumane behavior that targeted the Plaintiff in a malicious fashion and a series of events which still disturbs the Plaintiff to this very day.
- UNC Medical Center personnel behaved with malicious intentions during all 3 episodes of this scandal yet there has been no proper investigation or disciplinary hearings for the criminal conduct discussed throughout this document. The Plaintiff received absolutely no restitution for being the victim of so many crimes.
- Please see **Exhibit 1**.
- **The Plaintiff requests to the court awards hedonic damages of $50 million paid in full within the next 15 years.**

**Punitive Damages**

- It goes without question to state that the Orange County Sheriff's Office and UNC Hospitals associates have been in the business of using counterfeit court documents in order to repeatedly target the Plaintiff so that he would be held in a confined space in the hospital for an indefinite period of time. 4 illegal Involuntary Commitment documents were produced in Orange County, North Carolina beginning in February 2013 and spanning a time period which extends all the way until March 2019. The fact that there were 3 abductions/kidnappings using 4 counterfeit Involuntary Commitment affidavits yet there was the complete absence of compensatory and disciplinary action undertaken by each entity's respective department to discourage engaging in repeated criminal activities.
- **The Plaintiff requests to the court that punitive damages be awarded in the amount of $25 million paid in full to the Plaintiff within the next 15 years.**

MEDIATION

Because North Carolina is a mediation-required state, the Plaintiff has taken the time to retain a respected, intelligent, and impartial mediator named Eric Andrew Cinotti, who resides in Wilmington, North Carolina. Eric Andrew Cinotti's practice can be reached via telephone at (910)-321-8886.

TRIAL BY JURY REQUESTED

The Plaintiff insists that the Defendant be tried by a jury selected by impartial and unbiased methods. This is guaranteed by the **7th Amendment to the United States Constitution**, which states:

23

- *"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."*

## MISCELLANEOUS

- The Orange County Sheriff's Office and UNC Medical Center (with their associated personnel) are not protected from civil liability by means of qualified immunity. A law enforcement officer can be liable if they violate rights that are "clearly established" in light of existing case law (according to the Supreme Court in **Pierson v. Ray, 386 US547, 556-557 (1967)**). According to **Harlow v. Fitzgerald (1982),** qualified immunity is voided by showing that the defendant's conduct *"violated clearly established statutory or constitutional rights of which a reasonable person would have known."*

_____
Signature of Plaintiff

_____06/30/21_____
Date

4318 FLINTLOCK LN,
DURHAM, NC 27704
919-724-0265

24

EXHIBIT 1
LETTER EXPLAINING PLAINTIFF'S POST TRAUMATIC STRESS DISORDER

June 25, 2021

United States District Court
John Hervey Wheeler U.S. Courthouse
323 E. Chapel Hill Street
Durham, NC 27702

Dear Sir or Madam,

Please allow me to enter a both professional letter with personal elements for the record in order
for a deeper understanding behind what reasons lay subject to the damages I am seeking in this
lawsuit. I thank you for your sincere consideration.

As a direct result of the trauma perpetrated by the Orange County Sheriff's Office and the UNC
Medical Center and directed towards me during 3 illegal Involuntary Commitment episodes in
which illegitimate Involuntary Commitment affidavits were used to hold me in false
imprisonment – I have been diagnosed with Post Traumatic Stress Disorder (PTSD).

My PTSD has significantly altered my normal lifestyle and has led to an overall degradation of
my productivity and homeostasis. Before the events that transpired at the UNC Medical Center, I
was a very happy and successful individual with hopes and dreams. These days I cannot find a
job because of my disabilities associated with my PTSD diagnosis. Additionally, I used to enjoy
a vivid social life and an eager desire to learn. These days however, I struggle to focus on my
any kind of work, I have severe difficulties socially adjusting, even in familiar environments, and
I have recurring thoughts of the trauma I experienced at UNC Medical Center. Moreover, I suffer
from traumatizing nightmares and flashbacks about some of the experiences I lived through at
the hospital. My hopes and dreams have been shattered and I often find myself living a very
negative and unfulfilling path in my life. I have a severe case of PTSD as it has caused me to
behave and act in particular ways that have been extremely detrimental to both my family's and
my own wellbeing.

I experienced severe abuse and trauma when Dr. Dedesma and her staff did not let me use the
regular bathroom/toilet on 03/10/19. I was given the only option to defecate/urinate in a poop
bucket, that was given to me by the nursing staff all working under Dr. Ronit J. Dedesma – the
mastermind who played the central role in my treatment between 03/07/19 – 03/10-19. Yet, Dr.
Dedesma recorded absolutely no medical records in the official 2019 UNC medical records that
are available upon request. This omission still constituted healthcare fraud because it occurred
within the confines of a healthcare setting, and the omission was used for fraudulent means just
so Dr. Dedesma would not show up in the database that was using the illegal 03/07/19
Involuntary Commitment affidavit.

My treatment by the Orange County Sheriff's Office and by the faculty/staff at the UNC Medical
Center violated many of my constitutional rights. I feel that Dr. Dedesma deliberately attempted

EXHIBIT 1
LETTER EXPLAINING PLAINTIFF'S POST TRAUMATIC STRESS DISORDER

to humiliate me in the absolute worst way possible, in a fashion which robbed me of my happiness and utterly humiliated me in such a fashion that I still suffer from on a daily basis.

I am currently heavily medicated and cannot function properly without my medications. I had to go through the trauma of going through not one, not two, but three kidnappings at UNC – with the most recent (2019) leaving the most permanent and distressing psychological and mental scars that still dwell in the back of my mind. I am ashamed and disgusted at what happened to me and pray to God that it never happens again. Dr. Dedesma psychologically tortured me by holding me in false imprisonment for as long as she could under inhumane conditions. I find this behavior very disturbing and I have these thoughts of Dr. Dedesma haunt me regularly. These and other similar thoughts also keep me from living a productive lifestyle and bar me from living with peace of mind. If it were up to me, I wish I never went through the trauma that triggered this disease. This is something that I may have to contribute a large proportion (if not the rest) of my life to deal with, and this psychological suffering associated with it is something that carries a very negative connotation to my personal and professional realms of wellbeing. I routinely think of how unjust it is for the defendants to go without justice, as they have committed criminal activities that violated state, federal, and international law. I have suffered so much already, and it is only until now that the culprits will face civil action.

I find that I am not alone in dealing with the atrocities that occurred. My family and friends have experienced an indirect impact of the defendant's actions because my loved ones have seen me while I was in the lowest of my lows and have felt negative feelings about what occurred to me. For example, my two sisters who once looked proudly up to me as a role model and as a loving brother now see me as a disabled and a crazy person, which is not capable of taking care of himself. They do not think I have the mental capacity as I once had to succeed and view me in an inferior light. My family once thought I was a highly successful individual as I had graduated Salutatorian of my high school class of almost five hundred students, but now, my family views me with prejudice and associates me with being someone who is not mentally sane. This is a deep pain in my heart because the ones who I was closest to have completely changed the way they look at me and view me as a human being. This takes away from my self-esteem and confidence and makes me view myself as someone who a subordinate to everyone else. These feelings of inferiority spring from the reasons that led to me being diagnosed with PTSD and continue to linger in my thoughts to this very day.

I have bi-weekly PTSD appointments with my current therapist, Josh Heying, of B&D Integrated Health Services to treat my PTSD symptoms. Before this, I was receiving PTSD treatment from Kuniko Madden of the Carolina Outreach Durham ACT Team in 2018. The very first time I was diagnosed with PTSD was when I was being evaluated by the Carolina Outreach Fayetteville ACT Team lead and social worker, Andrew Hile. Both Mr. Hile and Ms. Madden have extensively gone through many thought exercises and other activities in an attempt to curb my PTSD symptoms so that I may one day live a normal life.

In short, because I was abducted and held in false imprisonment while being tortured at the UNC Medical Center, I have gone through tremendous psychological suffering and have been diagnosed with PTSD. Were it not directly because of the actions of Dr. Kenan Penaskovic, Dr. Ronit Dedesma, and others, I would not have been diagnosed with PTSD and would not suffer

EXHIBIT 1
LETTER EXPLAINING PLAINTIFF'S POST TRAUMATIC STRESS DISORDER

with the mental anguish I feel about my mistreatment. This suffering and PTSD has ruined my life in many ways and cause me to live a lifestyle with a much lower mental standard of living than what I am owed to as a human being. I wish I did not have to go through with PTSD-related suffering but it is due to reasons out of my control that I was treated as maliciously as I was – with both negligent and intentional spiteful motives that have permanently altered the course of my life forever.

I thank you for your time and attention.

Sincerely,

Tonmoy S. Nasiri
4318 Flintlock Ln
Durham, NC 27704
(919)-724-0265
teanasiri@gmail.com